et al. Oral argument not to exceed 15 minutes per side. I would like to remind the commission of the rule of thumb. Thank you. You may proceed. Good morning. Good morning, and may it please the Court.   in the past. There was a hospital group boycott perpetrated by the dominant hospital network in Dayton, Ohio. The target of that boycott was the medical center at Elizabeth Place, a small hospital that disrupted a stagnant market with lower prices and physician flexibility. And a specialty, right? It's a specialized hospital. No, Your Honor, it's a small hospital. I'm sorry. Does it cover lots of specialties everywhere from primary physicians to surgeons? I thought it was a surgical type hospital. It is a 26-bed inpatient acute care hospital. The procedures, it does not have an OBGYN. It doesn't have an ICU. So it is lacking certain departments. The record shows that part of the reason why it lacks certain departments is that it was boycotted from achieving the managed care it needed to generate the revenue to have that expansion. It has an OR, though, doesn't it? It has four ORs, four active ORs. The premier, but there are four hospitals there, right? There are four hospitals. There are five entities that have a joint operating company that they call Premier Health Partners. Yes. So four hospitals that were in operation previously and joined together in a network, as I understand it now. Those hospitals, have they bought the practices of their physicians? You understand what I mean? So that the physicians are paid a salary, their staffs, each physician's staff is paid a salary. The pricing of the medical service is set by the hospital. The collection is handled by the hospital. Or are there some, at least, of the doctors who are not employees in that sense that their practices have been bought? Is that clear from the record in this case how these four hospitals work in that respect? Yes, Your Honor. There are certain backroom, the record and evidence reflects that there are certain backroom consolidations among the four hospitals. So I think now that they're, and Mr. Farooqui can correct me if I'm wrong, but I think now that there is a consolidation of a single patient record database, they have a single accounts receivable database, accounts payable database. With respect to the hospital staff, it includes both physicians that are employees of the hospital, not of Premier, and not of multiple hospitals, but of a single hospital. But then there are also doctors who have a contract with them. And then I understand that there are yet further positions. You're saying there are some doctors whose practices have not been purchased in the sense that the doctor has become a direct employee of the hospital, and some of the doctors are and their staffs are employees. That's what you're saying? Yes, but it's my understanding of the record that there are some doctors who have privileges at the defendant's hospitals who are not. Approximately how many doctors are there in each one of these hospitals? I know you don't know exactly, but approximately. I know that back in 2006 their primary care physician network for Good Samaritan Hospital had over 100 good physicians. I couldn't even venture a guess. It's in the hundreds, Your Honor. So if you take all four of them, you've got a thousand, maybe, or some large number of doctors. And they're competing in the marketplace for doctors, basically. Correct, correct. The medical center challenged the group boycott as a per se violation of Section 1 of the Sherman Act. We're here today because the district court's summary judgment ruling held that we did not present evidence showing that that boycott involved an agreement among multiple parties. And with all due respect to the district court, factual disputes abound as to existence of agreements. And the first one I want to turn to is what we call the RIM agreements, which the district court did not discuss or analyze, did not review the evidence in any way, shape, or form. And this is the insurance companies? Yes. The RIM, you're talking about. Yes, what we call the payers. Both parties refer to them as the payers, but they are the insurance companies. Third party payors. Thank you. And our group boycott, as set forth in our papers, is a hub and spoke conspiracy. And we have, by the way, evidence. We have evidence of horizontal concerted action at the hub within the defendants, but also the actions of an understanding among the payers. And that's what I want to focus on. Yeah. You're claiming that the premier people for hospitals insisted with the payors, the third insurance companies, health insurance companies, that they exclude or boycott this plaintiff. Is that your claim? Yes, Your Honor. What is the evidence of that? Yes, there are written hospital agreements that the defendant hospitals had with each of the payors, and they contain what's been called a panel limitation. And that says that it's not an exclusive or closed network. That says that you may not add any new hospitals. So the competitor, Kettering, is grandfathered in. Children's Hospital is grandfathered in. But each of them say if you add a new hospital. They're saying this to the insurance company. It's in writing. Yeah, to the insurance company. Yes, if the payer adds a new hospital, then the defendants can terminate the managed care agreement. Well, isn't that a tying arrangement? That is, under the Clayton Act, if a marketplace participant insists to someone he's contracting with that it may not do business with a third person in order to prevent the third person from competing in the marketplace, isn't that a tying arrangement? Well, that's a Clayton 4, which is not a tie. But there's a Clayton 4 that says that if you offer a product, not a service, and that's why this can't be a Clayton 4 because these are hospital services. But it can be covered under Section 1 of the Sherman Act. So it's the same theory? Same theory. The defendant is on a service. Yes. That's one of your claims of antitrust violation. Yes, Your Honor. There are three agreements. The HUB, which is the American Needle that we'll get to shortly, which is the agreement among the defendants to take steps to stop or hamper or exclude or force out of the market my client. Then there are agreements between those defendants and each of five or six payers, written agreements where they say, if you add another hospital, we can terminate this. Or we can say that we want to renegotiate the rates. And the evidence shows that that renegotiation rates is an effective termination, that no one wanted to renegotiate the rates because the defendants represent 55% of the business in Dayton. This is a complicated case. It's, I think, a very significant case because my understanding is the health care business is becoming a network sort of business. In Tennessee, we've got the same thing. The dominant hospitals are making deals with outlying hospitals or other hospitals to form a network. So that seems to be the direction in which health care is going in many places, right? Yes, Your Honor, but the agreements that we have here is right out of the Comtel-Duquesne case that this court handed down in 1982, where you've got competitors of my client going to a supplier that we need to participate in the market and getting them to agree not to supply us. But it's important that we understand the agreements between the payers because that's a separate horizontal form of agreement that is an independent basis for reversing the summary judgment decision. And if I could just briefly talk about that. This is about the insurance companies, right? Yes, the insurance companies. And the district judge didn't rule on it because he didn't present it? We presented it ad nauseum in our opposition brief. He did not look at it, and I don't know why he did not consider the evidence. All right. I could read tea leaves, but my guess is as good as his. Don't they say that you waived it by not? Well, they do say we waived it, but we didn't waive it, Your Honor. First is that we presented it in our opposition papers on summary judgment, and the defendants claimed that they responded to it in their reply brief. But more importantly, we allege in our complaint a group boycott between the defendants and each of these payers, and we identify every one of the payers by name. And we did it based on evidence that we had at hand. When we went into discovery, we got evidence of this agreement among the payers, not just the spoke, the agreement, the written agreement, but an understanding among the payers that, okay, if you don't add anybody to your network, I won't add anybody to my network. And that kind of hold the line came through discovery. And for the defendant, the defendant's argument would require me, let's say I was going to bring a, I brought a price-fixing claim, and I had conscious parallelism. All right, so I had parallel conduct. And I said, okay, you went to a meeting, and then you raised prices. And so I alleged parallel conduct. And then during discovery, I got evidence of a written agreement to fix prices. They would say I have to come back and amend my complaint to say, oh, now I have a written agreement to fix the prices. When the other side brings a motion for summary judgment, you oppose the motion. And then alternative, well, if that's, if you were going to grant that in the alternative, I ask permission to amend to allege the cause of action. And here's the proposed amendment. I mean, that's what we see routinely. Yes, Your Honor. You didn't do that. But we didn't need to because it's the same claim. It's a group boycott claim. It's just the evidence used to prove the group boycott claim. It's still, we allege an agreement among the payers and the defendants to exclude MCEP from managed care contracts. That's what our claim was. That's the sole basis for the per se. And we allege per se because we have horizontal concerted action at two levels. At the level where we compete with the hospitals, and understanding among the layers, like in the Toys R Us, the people who supply all said, okay, if you don't open, give MCEP a contract, I won't give MCEP a contract. The claim is exactly the same. It's just the type of evidence. So there was no need. And they actually, in summary judgment, Your Honor, they didn't say they waived this because they didn't amend. They should have amended their complaint. That was first brought before this court. Would this be a matter that we could rule on or that we ought to, if we were to agree with you, that we should remand to the district court for the district court to rule on the first instance since we don't have a ruling on it? Well, I think that since it was presented for the court, to the court below, and they chose not to rule on it, for this to avoid the idea that if they, let's say, for example, you affirm on the finding on the American Needle decision, but you remand back down to here, then we're going to get, we could definitely end up with a second appeal, right? If you decide both and you've. It will delay everything. It will delay everything. It will require piecemeal appeals. If you take it now and you agree with us that we've presented evidence of the first remax factor, that these actions of the payers, these refusals taken independently would be contrary to their economic self-interest, this court has said when you have evidence of that, that will consistently tend to exclude the likelihood of independent conduct, and that will allow us to go back for the whole case for trial, not to be brought back up here until there's a trial. If I, I'd like to, I don't know where I am on time, but I'd like to briefly touch the American Needle, if I can. And this is an important piece because this will be, this is the first chance this court has had a chance to look at American Needle. The court, although it says it applied American Needle, really defied its directives. First, it said that it held that contractual control is sufficient to demonstrate that they're a single entity. That was at page 7. That's the NFL case. Yes, that's the NFL case. But the NFL, the Supreme Court in the NFL case said you can't have a single entity just based on contractual control. It would be too easy for competitors to get together, give some management to a JOC, and collude under the guise of contractual control. So contractual control is not enough. What has to happen is one of two things. Either that there's a combination of resources combining, pooling the capital, joint ownership of assets, or they have to demonstrate, or they have to demonstrate that even if there isn't, that there's no evidence that they compete with each other. So competition is gone. We have evidence of both. There is no doubt that there is no shared ownership of assets. And this is really an important piece that is because in 2012, the NFL and its teams were sued again under American Needle. The plaintiffs this time were former players who said that they were. It's a little different, though, because there you've got a product that was at issue, and the question in the Supreme Court for purposes of that product was is the NFL a cartel or is it a single entity? The Supreme Court said for purposes of the product sales, it is a cartel, essentially. Yes, but in that case it was because the product at issue, the game films, were jointly owned by the team and the NFL. And the district court said the NFL and its teams can conspire with respect to marketing products that they separately own but not with respect to products they collectively own, and that's why the shared ownership of assets is so critical. And the lack of it in this case is so critical a fact that would require a reversal on the idea that the defendants cannot be considered multiple parties for purposes of Section 1. Mr. Ripley, you can use your three minutes rebuttal. No, I would like to reserve it. Thank you, Your Honor. Thank you. Any further questions at this time? Good morning, Your Honors. May it please the Court. I'm Charlie Ferrucchi with me at Council Tables, my law partner, Laura Sanum. I'd like to address the American Needle, the hub issue that Mr. Ripley just spoke to. Can I ask you a few factual questions? Of course, Your Honor. This is a complicated case, and I have one or two factual questions. The way the premier operation works is you have 55% allocated of the profits or the revenues or I'm not quite clear what, but. Net income. Net income to a particular hospital and then other percentages to the other hospitals. Correct. Obviously, you don't do this on a daily basis. In other words, each hospital is billing its third-party payors or its patients or whoever owes the money and bringing the money in, and you've got each one has got its own pricing situation, and each one has got its own collection situation. No, Your Honor. Do you have a central pricing mechanism so the same price exists for all doctors in a particular specialty for a particular operation? For all hospital services, yes, Your Honor. Where is that in the record? The first place it's in the record is in the joint operating agreement that governs this joint venture, Your Honor, and the page ID 8668 is the section that explains the network net income and the allocation of net income. What I'm asking you about is who establishes and how do they establish the price of the service, the medical service, and normally that is established by the doctor if the doctor is independent or by the hospital if the doctor's practice has been purchased. Let me pull that question apart. If the doctor is independent, the doctor or his practice bills for that service, but if the doctor is an employee, then like other services, the hospital, the premier bills it because it's the joint operating company. Do you have both kinds of doctors in the complex? We do. You have both kinds? Both the large systems in Dayton, Your Honor, Kettering and Premier have acquired doctor's practices as you referenced earlier, and when they're employed by the hospital, then their services are billed by Premier, and that appears in the record to answer your other question at page ID. How does the collecting of the revenues? Premier? Premier is, and let me step back for a moment. You have a central office that bills the third-party payors, one office, not individual hospital offices. That's exactly right. The hospitals don't do it. The page ID reference is 8664. That's section 5.6 of the joint operating agreement, and what it provides is that Premier, the joint operating company, this is a quote, is the sole agent to negotiate and manage all relations with payors, so it's not done at the hospital level. Where does the money come? Is the money paid to each hospital? No. No, all of that has been centralized in the joint operating company, and when you look at the joint operating agreement, you'll see that it states that its purpose is to create an integrated hospital system, and Premier does all of the billing and all of the collections, and these rates that Mr. Ripley was talking about that were negotiated were negotiated by a department under one of the gentlemen who was deposed, Mark Shaw, a vice president of Premier, and he does all of the negotiation and all of the rate setting for all of the hospitals and all of their services. So the individual hospitals don't have bank accounts. They do not. Premier handles all of them. He's got the only bank account in the deal. Yes. What about the doctors who are not employees of the hospitals, who have privileges at these hospitals? Those doctors are independent practitioners, as my dad was, billed and provides his services and bills them separately. Okay, and so what percentage of the doctors at any given hospital would that probably be? Well, as time has gone on, more and more doctors have opted to sell their practices to hospitals because of the complexity of medical billing and so forth. These days, I agree with Mr. Ripley, the number of doctors employed by the hospital would be in the hundreds at each of the hospitals because they have people called hospitalists. Yes, I've run into that. I have too. So you have hundreds of doctors employed by the hospitals, but given the service area of Premier, you have hundreds of independent doctors in various practices. Would you say just ballpark that it's half and half? That's probably not a bad ballpark, but so I don't misstate things. I'm really guessing there. Yes, that's what I asked for. It was in the record. Right. Excuse me. Go ahead if you've got a question. Because I've got so many questions. No, I'm fine. Let me ask you this. How do you set the 55% for this hospital and the 30% for that hospital or whatever, and how long does that last, and if conditions change, circumstances, how do you change it? The first question, how do you set it, it was set by negotiation at the time that the hospitals, Premier started in 1994, long before MCEP was created, with the jointer of two hospitals in a joint operating agreement, and that percentage was negotiated. When additional hospitals came in, each time that happened, Upper Valley Medical Center, for example, when it came in, the percentages got renegotiated. And who does the renegotiating? The various hospitals. When you're adding the CEOs of the hospitals, who are the people and who do they work for who do the renegotiation? When a hospital is coming into the network and is independent, it's that hospital's CEO who negotiates with Premier's CEO. Now, as time goes on, and you want to reset it. Does Premier's CEO then confer with the CEOs of the individual hospitals to see what their preferences are or something? No, the Premier's CEO can fire the hospital CEOs. Premier's CEO is the boss. Yeah, but they wouldn't confer or try to get a consensus about these percentages, which would be pretty important, how much money you're going to end up with. I think that's a matter for the Board of Directors of Premier, not something that management sets because the allocation is so fundamental. Board of Directors, does it have representatives for each hospital? Yes. So you've got a board that's set up to represent each hospital. Premier has a Board of Directors, and it's shareholders in effect. It's a shareholder or constituent model. If you need to make a change, the board would make the change. They would have to make the change. But then each hospital has a board of its own. It does. And what you see in the joint operating agreement, your questions, if I can step back for a moment, also from what I was going to cover, your questions go to a fundamental point here, and that is that this joint operating agreement is one that integrated centers of decision-making that formerly were separate in the hospitals into a joint venture. When you look at the JOA, the joint operating agreement, it says that Premier, the joint operating company, has control of all of the joint operating activities. That's a defined term. And when you look at what joint operating activities consist of, it consists of every activity, every activity unless it's specifically excluded. It's very broad. So it rests in Premier, not in the individual hospitals, and this distinguishes our case from American Needle. It vests in Premier operational, strategic, and financial power. But the hospitals, nevertheless, the four hospitals are doing, for instance, their own marketing, which suggests that they're in competition with each other to get patients. Is that not correct? It is not correct. Less disputed, isn't it? I mean, there's proof in here that a lot of people in the hospitals think they are competing with the other hospitals in the group. Yes, let me talk about that. To go back to your question, Your Honor, the reason that I said it's not correct is that they are not in competition with each other because all of the money that comes in goes to one network bottom line. Economically, there is no competition here. That's what happens in a cartel, too. Well, if you look at the Supreme Court case Texaco v. Dogger in 2006, which said that when companies that share risk of loss form a joint venture to do that, that joint venture is considered a single entity under the Sherman Act. The Supreme Court said several times, not just once, that you've got to look carefully to see whether the single entity is not really a cartel that is sharing money, that's true, but is also competitive in the marketplace with each other and has the power in the marketplace to boycott and to exclude competitors. Yes, Your Honor, and let me deal with the... Well, that's one thing you've got to deal with here because, you know, that's the basis of antitrust law. The H-Works documents upon which they rely were ones that came from a consultant study, a physician that was hired, and the purpose of that consultant study was not to assess the economic integration of Premier but to determine, this is quoted at page 9 of their reply brief, to evaluate Premier's goals against those of competing healthcare systems and discuss what changes should occur. It was an efficiency exercise. The district judge, at page 10 of his opinion, correctly found that those H-Works documents were immaterial because the question here for you and for the court is whether there was economic unity. Now, this court in Kentucky Speedway... That much is a unity. But there are a lot of other ways in which they are not an entity perhaps, and that's, you know, there are a lot of factors involved in this, and the question is which way do the factors weigh? And in American Needle, the court said the question is not whether the parties seem like one firm or multiple firms in any metaphysical sense. The question is whether they are economically integrated, and here they are because they have one network income and one company, Premier, that is controlling their operations, controlling their strategy. They have a board made up of each one of the perhaps competing hospital units. Yes. And the board is final. And the board of directors has management authority over Premier, but Premier is the one that sets the rates in this case, not the hospitals. The board sets the rates. No, Premier sets the rates. The board authorizes the CEO, the managers, to do what they do. Yes, but you don't in corporate law or here, you don't attribute to a board of directors separate entity status because it has constituent representatives. It's the board of Premier. Sometimes you do and sometimes you don't. It depends on the marketplace and the way the facts work. Your Honor, under American Needle you do not, and let me speak briefly to that before I turn to the rim. American Needle, as you've heard and saw in their brief, is their key case. When you look at the facts of American Needle, they are far removed from this. In American Needle, the court said each team was an independently managed business. The teams were separate profit-maximizing entities, and it said at page 197 when each team licenses intellectual property, it is not pursuing the common interests of the whole league but instead the separate interests of each team. The court even said at page 200 of its opinion that it was one of the Supreme Court's words, rare cases, rare cases in which a single entity would not be found because the components of the firm were not acting to maximize the firm's profits. A far different situation with Premier because the actions maximize the firm's profits, which go to the bottom line. Maximize the hospital's profits, right? No. First, I mean, it's distributed among the hospitals, 55%, 20%, 25%, right? That's where the money goes. It is distributed among the owners of the hospitals according to a preset percentage. So if my hospital makes more money than your hospital, at the end of the year it doesn't matter that we made more money. Our percentage is still the same. That's the unity of economic interest here. That can be changed by the board if the circumstances change. Over time it could be. But then the same situation would obtain after it was changed by the board the next year. It's a preset percentage. Let me turn in my remaining time, a little as it is, to the RIM, the claim that is not in the amended complaint. And I'd first offer you a reference to the point where Mr. Ripley told us. This goes to the tardiness of it. Mr. Ripley admitted at page ID 3637 that this claim was not in the amended complaint. That was in our expert's deposition. Say that again? Page ID 3637 in the trial court, Mr. Ripley asked our expert a question about this RIM conspiracy. Our expert witness, whose deposition I was defending, said, I don't remember seeing that in the complaint, sir. And Mr. Ripley said it's not. He has a different position in front of you. Okay. This is in a deposition that was just an offhand comment by the attorney? It was a representation to the witness. I'm not quite sure if that's an admission by the party, but okay. All right. It came up on summary judgment in opposition to one of our summary judgment motions. After two years of discovery, 45 depositions, including 14 of the insurance companies, including two lengthy expert reports, they had an expert solely on the issue of damages. That expert did not opine on this. And we have cited cases indicating that in that circumstance when a theory has been pursued by a party and then they want to add to it or change it in response to a summary judgment motion, that's prejudicial. They have a single per se count, and your honors are more capable than Mr. Ripley and I of determining whether, as he claims, this boycott was in the amended complaint. But the rim theory was not, and it was tardy and should not be considered. Would additional discovery be necessary if this were allowed? Yes. And how long has discovery proceeded at this point? Two years. What do you want to put on that's not in there? Well, what we had was a series of depositions of some of the payors. They were Rule 30b-6 depositions in which the questioning went to what we call, he calls them panel limitations, but it's for volume clauses where Premier offered lower rates for its 1,500 approximately beds in exchange for an assurance of volume. And so these depositions ---- This is with the payors. Yes, sir. And so ---- For all the patients in there. Exactly. And so that was the focus of the discovery. Precisely, what evidence do you want to put on or introduce that is not present now? Well, the insurers, of course, were nonparties and resisted discovery requests from both sides to some extent. And if we had to deal with this claim, we would want to go back and have further discovery of these payors because the record as it stands now does not show communications among the companies at the rim. In other words, payor 1 talking to payor 2. Instead, the record shows Premier talking to you as a payor, talking to you as a payor, talking to you as a payor separately. And so ---- Well, wait a minute. That's their element of proof, isn't it? It's not yours? Well, it is, but I always approach this, if I'm going to try a case, I want to have the witnesses tell me that there weren't such things. Oh. We haven't. Okay, but this goes to the merit. It does. If we consider the merits, then you're saying that the facts just don't show. Yes. I was responding to Judge Merritt's question. On this rim claim, and they haven't presented it in response to the summary judgment. Yes, Your Honor. Let me, my time's up. Let me conclude this way. There are three cases, Your Honor, that present insurmountable hurdles to their claim. And the first of those is the Kentucky Speedway case from this court in 2009. It's our brief, pages 19 and 20, which says that antitrust actions are barred against companies under common ownership or companies that exhibit a unity of interest. We cited that, and their reply ignores it. Another case that I already mentioned is the Dogger case, Texaco v. Dogger in the Supreme Court in 2006. That case was misrepresented to you at page 50 of their brief when they said Dogger does not address single entity status under Section 1. You did all that. You've got it all in your briefs about that. We did. The last case, Your Honor, is this court's most recent discussion of ambiguous evidence in how it's to be treated under Matsusha, the Supreme Court case. It's Highland v. Home Services. We talked about that case extensively in our brief. It's a 2014 Sixth Circuit case. They never mention it in the reply brief. It set a very high standard, namely that for circumstantial evidence to be considered as proof of conspiracy, the evidence must eliminate a finding. That's a quote from this court, must eliminate a finding that the same actions are equally consistent with independent conduct. Thank you, Counsel. You're out of time. Any further questions? No. All right, Mr. Ripley, you have three minutes to rebuttal. Thank you, Your Honor. Let's start with American Needle. American Needle didn't decide that there were factual disputes as to whether the teams could be considered action, which is why we're here. They held as a matter of law that they were separate entities. We're not seeking that. So there was not a decision that so as a result, the facts that they talk about in terms of the separately managed, the things that don't exist here, that prevents me from asking this court to issue rule as a matter of law that they are separate entities. We say there's a disputed fact, and here's some of the elements of that. First, Mr. Farooqui says that Premier is the only one with a bank account. Well, the record has Premier's tax returns from 2006 until 2010. No revenue, no expenses, no assets, no liabilities, no employees. So I don't know where the bank account is. Second, the revenue sharing, the American Needle said that is immaterial to a consideration because anybody can construct a revenue sharing thing that would enable a cartel to exist. So the revenue sharing is a non-issue. The JOA in Exhibit 1.12 of the JOA excludes certain hospital services that Miami Valley, Upper Valley Medical Center, and Atrium Medical Center can pursue. Then that revenue doesn't go to the JOA. Next, there's a provision in the JOA that says where the parties have a dispute, they have to sue each other in arbitration. And, in fact, Mr. Farooqui represented the JOC in an arbitration against one of its members, the CHI, where CHI was told to pay millions of dollars, and that's in the record. So there's disputed facts on how the JOA is written is really how things work. I want to talk about the H works. It doesn't matter the purpose of it. The defendants hired someone to interview their top senior management. The defendants knew the questions that were going to be asked. They selected the people they wanted to be in the sessions to hear the questions and give their observations. When you have someone said that someone, and one of the very first ones is handwritten notes of an interview that included premier's president, premier's COO, CFO, head of HR, general counsel, and the first thing is, in quotes, we compete with each other. That's it. That creates a disputed fact under American Needle that when they compete with each other to take their own business, they're not helping the whole because if Miami Valley takes business away from Good Sam, it helps Miami Valley's individual piece, but it doesn't help the overall. Yes, Your Honor. I apologize for asking questions, but what is the relevance in this case, this part of the case we're talking about, of the conversation that is in the briefs here and the record between the plaintiff's CEO, I guess it was, or representative and premier in which, where the premier person told the plaintiff's executive, we're going to run you out of business. You won't exist, and sort of explain in a very general way how that would be done. What is the relevance of that, if any, to this single entity, multiple entity problem? Well, it goes to the idea that they did engage in joint action, right? They said we are going to do everything we can to run you out of business, so there's no dispute that the action was taken by the group as opposed to saying it was only Miami Valley. The question is whether they have combined their resources because DOGGR just doesn't say combined risks and rewards. It says you have to combine your capital. They don't combine the capital. They separately own it. And under American Eagle, when you have separate ownership, you compete with one another. At a minimum, there's a question of fact of whether it's concerted action. I want to touch briefly, Your Honor, on my statement to their employee, their expert. You don't need to worry about that. No, go ahead, but that's the final comment. Yes, is that what I told that expert is that that theory was not expressed in the complaint, but the claim is exactly the same, exactly the same, and we need no other evidence. We elicited the evidence from all of them. We elicited the evidence that we put in our brief on the first factor of REMAX, and that's all that is necessary. There is not a new claim by virtue of this agreement. It is just a type of evidence that proves the group boycott that we alleged in our single count of our complaint. Thank you, Your Honor. That wasn't your theory? I mean, I'm not quite sure. You alleged the claim, but you are not proceeding on that theory. No, we're proceeding on that theory, Your Honor. We had evidence that the defendants were separate, right? So we said they were horizontal. We cited Comtel and Duquesne in response to the motion to dismiss. We said we have evidence that they're separate. They compete with us. They got these individual payers to not do business with us. We didn't have the evidence of the communications. We didn't have the evidence that one payer goes to Premier to discipline another payer. You have it now? It's in the record. It's in our brief. All right, anything further? All right, thank you. Thank you, Your Honor. The case will be submitted.